# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

**Gregory T. Pressey**
3425 5th Street SE, Apt 12
Washington, DC 20032
(Plaintiff)

Case: 1:25−cv−01663 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 5/23/2025
Description: Pro Se Employ. Discrim. (H−DECK)

v.

**Shakespeare Theatre Company**
516 8th Street SE
Washington, DC 20003
(Defendant)

---

## I.    INTRODUCTION

This action is brought under **26 U.S.C. § 7623(d)** of the Internal Revenue Code, enacted through the Tax Payer First Act of 2019, to redress unlawful retaliation against Gregory T. Pressey, a former employee of Shakespeare Theatre Company. Plaintiff was terminated for reporting conduct that he reasonably believed constituted violations of federal tax laws, specifically the improper provision of substantial donor benefits such as gala tickets and other event access in exchange for contributions made through Donor-Advised Funds (DAFs) and Individual Retirement Accounts (IRA). Such actions violate IRS regulations prohibiting more than incidental benefits for such contributions and undermine lawful charitable contribution substantiation rules under the Internal Revenue Code.

## II.    JURISDICTION AND VENUES

1.  This court has subject matter jurisdiction over this action pursuant to **26 U.S.C. § 7623(d)(2)(B)** and **28 U.S.C. § 1331,** as the action arises under federal law.

2.  Venue is proper in this district under **28 U.S.C. § 1391(b)** because the events or omissions giving rise to this claim occurred within this judicial district and Defendant's principal place of business is located here.

3.  Plaintiff has complied with the administrative exhaustion requirements of **26 U.S.C. § 7623(d)(2)(A)(i),** having timely filed a complaint with the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) on October 25, 2024, and has not received a final decision within the 180-day deadline.

### III.    PARTIES

4. **Plaintiff, Gregory T. Pressey,** is a former employee of Shakespeare Theatre Company and resides in the District of Columbia.

5. **Defendant, Shakespeare Theatre Company**, is a non-profit incorporated in the District of Columbia with its principal office at the address listed above.

### IV.    FACTUAL ALLEGATIONS

6. Plaintiff Gregory T. Pressey was employed by Defendant Shakespeare Theatre Company from January 8, 2024 until his unlawful termination on September 11, 2024 that was effective as of September 13, 2024, earning an annual salary of $90,000.

7. During the course of his employment, Plaintiff became aware that the defendant solicited and accepted charitable donations through Donor-Advised Funds (DAFs) and Qualified Charitable Distributions (QCDs) from IRAs, while simultaneously offering substantial donor benefits; specifically, tickets to high value gala events and exclusive access perks as an inducement or reward for such contributions.

8. Plaintiff reasonably believed that such conduct violated Internal Revenue Code provisions, including:
   - **26 U.S.C. § 4966(c)** (prohibiting more than incidental benefits from DAF contributions),
   - **26 U.S.C. § 408(d)(8)** (prohibiting any benefit in return for QCDs),
   - and **26 U.S.C. § 170(f)(8) & (f)(18)** (requiring proper substantiation and acknowledgment for charitable deductions and excluding gifts where benefits are received in return).

9. Plaintiff raised these concerns internally and/or reported them to authorities as required by law beginning in February 2024 up until August of 2024.

10. Shortly thereafter, Plaintiff suffered adverse employment actions including heightened responsibilities, hostile work environment, discrimination, and termination which was motivated by his protected disclosures.

11. Defendant's actions constitute unlawful retaliation in violation of **26 U.S.C. § 7623(d).**

12. As a result of Defendant's unlawful conduct, Plaintiff has suffered loss of employment, reputational harm, emotional distress, and other economic and non-economic damages.

### V.    CLAIM FOR RELIEF
(Retaliation in Violation of the Taxpayer First Act - **26 U.S.C. § 7623(d)**)

13. Plaintiff realleges and incorporates all preceding paragraphs.

14. Plaintiff engaged in protected activity by reporting what they reasonably believed to be violations of federal tax law by their employer was offering donor benefits in exchange for contributions made through Donor-Advised Funds and Individual Retirement Accounts, in violation of IRS regulations.

15. Shortly after making these disclosures, Plaintiff was subjected to retaliatory conduct, culminating in their unlawful termination.

16. Defendants actions constitute unlawful retaliation in violation of the Taxpayer First Act, **26 U.S.C. § 7623(d)**.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this court enter judgment in their favor and against Defendant, and order the following relief:

– A declaration that Defendant violated **26 U.S.C. § 7623(d);**
– An award of Front pay;
– Compensation for lost wages, benefits, and other economic losses, estimated to exceed $97,650;
– Compensatory damages for emotional distress and health-related impacts, including hypertension and cardiac symptoms, in an amount to be determined at trial;
– Pre and Post-judgment interests
– Any other relief the court deems just and proper

**Plaintiff seeks damages in excess of $195,000, including back pay, compensatory damages for emotional distress and health impacts, and all other relief available under 26 U.S.C. § 7623(d).**

## VII.   JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

---

**Respectfully submitted,**

Gregory T. Pressey
3425 5th Street SE, Apt 12
Washington, DC 20032
(202) 848-0100
gregory.pressey@yahoo.com

**Date: 5/20/2025**

**Signature:**

## Fw: "Confirmation: OSHA Online Whistleblower / Retaliation Complaint filed on 25-Oct-2024

From:  Gregory Pressey (gregory.pressey@yahoo.com)

To:     lhenry@ericsiegellaw.com

Date:  Tuesday, December 10, 2024 at 04:40 PM EST

----- Forwarded Message -----
**From:** "whistleblower-complaint@osha.gov" <whistleblower-complaint@osha.gov>
**To:** "gregory.pressey@yahoo.com" <gregory.pressey@yahoo.com>
**Sent:** Friday, October 25, 2024 at 09:16:28 AM EDT
**Subject:** "Confirmation: OSHA Online Whistleblower / Retaliation Complaint filed on 25-Oct-2024

Thank you! As of October 25, 2024 09:14:01 AM US Central Time, you filed a whistleblower retaliation complaint with OSHA using our online filing system. We advise that you print or save a copy of this email for your records.

The reference number for your complaint is ECN114077

An OSHA representative will contact you using the contact information that you provided in your complaint. It is very important that you respond to such contact; OSHA cannot proceed with an investigation until it has discussed this complaint with you.

If you have questions regarding the status of your complaint, please feel free to call your local OSHA Regional or Area Office.

We appreciate the opportunity to be of service of you.

Note: Please do not reply to this email. This is a system generated email and this email account is not monitored.


Untitled
9kB

**Title:** "Narrative Timeline of Tax Fraud, Discrimination, and State Registration Violation Allegations at the Shakespeare Theatre Company"

**Prepared for:** Jake McCord-Wilbert OSHA WB Complaint: Shakespeare Theatre Co. Case 301044286

**Prepared by:** Gregory Pressey

**Date:** February 5, 2025

---

## Purpose

To explain and outline key events related to tax fraud, state registration violations and workplace discrimination discovered by the former Director of Development Operations at the Shakespeare Theatre Company (STC).

## Introduction

On **December 6, 2023**, I Gregory Pressey applied for the Associate Director of Development, Institutional Giving position at the Shakespeare Theatre Company (STC) (**Appendix A**). However, I learned after being hired that due to STC's discriminatory business practices / hostile work environment the development department had experienced high turnover and that my application as well as my professional background presented itself as an opportunity to the organizations Senior Director of Development Laura Willumsen who several days after December 6th contacted me via a telephone call to propose a different employment opportunity, a Director of Development Operations (DDO) position in replacement of the initial job I applied to. Additionally, I learned during my two weeks of training with Sarah Pultz (Sarah) STC's tenured DDO that she was quitting the job because she did not accept STC's treatment as it regards compensation for her position. Sarah believed that she deserved higher pay for the DDO position of which Sarah promoted into with little to no background knowledge in the work outside of understanding how to use Tessitura the org's system of record / constituent relationship management software (CRM). I have attached a copy of the position description provided by STC's HR team for the DDO position for your review (**Appendix B**).

On **January 2, 2024**, STC offered me the job for the DDO position at **$85,000** but I negotiated for a higher compensation, and we landed at **$90,000 annually** although I too like Sarah believed the salary should be higher. Prior to working at STC I earned $115,000 annually as a DDO. My first day on the job was **January 8, 2024. Within 2-month's** I discovered a host of improper fundraising and gift accounting business practices and discriminatory patterns of which I argued against for months thereafter bringing them to the direct attention of Laura Willumsen, Senior Director of Development at the Shakespeare Theatre Company. On **May 8, 2024**, I emailed Laura to inform her of the continued resistance/sabotage I was experiencing cross departmentally from the IT and Accounting teams and Laura suggested that she would like for me, her, and the

Interim President of STC Susie Medak to meet and discuss these issues (**Appendix C**). That never happened, I believe Laura truly did not want to have that conversation as my claims were also a direct reflection on her inabilities and knowledge of job; Laura was doing her best to control the narrative. On **September 12, 2024**, STC terminated my employment and the reason STC provided was No Cause (**Appendix D**). To add a little more background to Sarah's transition, Sarah quit the Shakespeare Theatre Company earning approximately $85,000 annually for Folger Shakespeare Library who gave Sarah a start date of **January or February 2024** earning approximately $110,000 annually but ended her employment **in less than 90 days** from hiring her. While attending the 2024 Tessitura Learning Center Conference, a 4-day social event, I spoke with Tina Contis-Quinn the Executive Assistant to the Director of Development at Folger, I learned that there were challenges with Sarah's performance. However, Laura supported Sarah's business conduct so much that she asked me if I would hire Sarah back as my support and I told Laura no, however Laura insisted. To date, Sarah works for STC (**Appendix E**).

<u>**Key Issues**</u>

1. **Tax Fraud:** While working at STC I discovered that the organization engaged in tax fraud providing improper benefits such as Gala tickets and memberships to donors contributing through donor-advised funds or IRA's, potentially violating IRS regulations.
2. **Discrimination:** While working at STC I experienced resistance to my leadership as the only black man in a senior management role and other discriminatory practices.
3. **State Registration Violations:** While working at STC I witnessed the intentional omission of key information essential to maintain or acquire solicitation registration with the State.

<u>**Timeline of Events**</u>

**Tax Fraud:**

**Date / Time Period – Within 2-months** on the job, in **February 2024** I discovered that STC engaged in providing improper benefits such as Gala tickets and memberships to donors contributing through a donor-advised fund or IRA. I discovered this after receiving an email from a donor through STC's donor services hotline requesting STC provide their contribution tax receipt for a donation made in the early months of **2023 (Appendix F)**. In researching the donor's form of payment with the support of STC's development and accounting staff (Laura Willumsen Senior Director of Development and Marco Dimuzio Senior Staff Accountant), Laura or Marco would send me check copies or direct me to where I can find hard copies in files, print screens of wire transfers, and any background information/documentation STC decided to archive. Through my research I discovered that STC offered its donors Gala tickets / tables and memberships in exchange for those donations. I confirmed this by comparing the form of payment against the accounting codes in the CRM, as well as the event attendance and other system notes and learned that the donors used the benefits offered and that staff had freewill to manipulate that data as they see fit due to system configuration. I also learned that STC did not always issue tax receipts / acknowledgment letters to donors, especially donors who received

2

Worst, I learned that STC recorded donations from individuals and corporations as a hard credit donation from Ameriprise essentially giving the illusion that Ameriprise made the donation. For example, STC's development and accounting team recorded a donation from UPS for $25k as a donation from Ameriprise on behalf of Michael Beriss, a donation from Pepsi Cola and its employee, and a host of other employee payroll donations from other organizations. It appeared to me that STC and Michael Beriss were protecting their monetary interest. I also believe that STC receipted Michael Beriss for those gifts fraudulently. Additionally, Laura had Sarah worked together to construct an email that made it appear as though Sarah made a mistake and that she and I both fixed the error. This was the primary reason why I did not want to bring grew very suspicious of she and Laura's business practices. Here's why, for example, STC has receipted donors where the donation amount was extremely higher then what the donor actually contributed (**Appendix T**). Meaning the donor gifted the org $2500 and was receipted for $12,000. Something like that never makes it past an accounting team that reconciles its revenue frequently. STC Board Member Stephen Ryan and others have received receipts with inflated contribution amounts or worst for gifts they have not contributed. Post the **April 1, 2024**, meeting STC continued to accept contributions through DAF's and IRAs and would allow donors to pay for the tax-deductible part of their contribution from a personal bank account or credit card and the remaining part of the contribution to be paid through the DAF or IRA in exchange for benefits such as Gala tickets and memberships.

**Discrimination:**

**Date / Time Period – Between February and August 2024,** I began to see discriminatory patterns within STC's workplace dynamics. Such as being micromanaged while peers are afforded autonomy, employees and subordinates resisting or disregarding my decisions/solutions due to implicit biases, Laura imposing stricter performance standards compared to those applied to others in similar roles, subtle forms of exclusion from strategic planing sessions, dismissing ideas or contributions during discussions in favor of input from others, and increased pressure expressed through excessive demands (**Appendix I**). **Between February and August of 2024,** Laura and I met weekly to discuss development operations and every week I highlighted the department's most pressing issues and/or challenges emphasizing the two primary issues/challenges which were the overall configuration and administration of CRM and its impact on workplace dynamics to include my success as a new hire (**Appendix J**). As well as an immense need for professional development of existing staff (**Appendix S**). During Laura and I weekly development operations meeting I would often explain my challenges, setbacks, and solutions by providing examples or in most cases reiterating the magnitude of the issue and its impact. As the DDO I advised staff on how to interpret fundraising-information in CRM and worked with staff to streamline the usage of existing supportive fundraising systems as an effort to increase workflow efficiencies and funds raised. However, I had to do that in collaboration with STC's fundraisers and the Database Administrator Brian Grundstrom (BG), a tenured employee whose intentions were to be difficult as he resisted my leadership and often dismissed

4

gala tickets or a membership after contributing through a DAF or IRA. Worst, at times STC would provide the donor benefits and still issue the donor a tax receipt / acknowledgment letter providing the tax blurb of no goods or services provided.

On **April 1, 2024,** Laura and I met to discuss development operations. The purpose of our meeting was to discuss the concerns I had raised for months about STC's business practices on gift accounting and receipting. During that conversation I assessed that Laura was intentionally confusing my statements and pretending to be ignorant on compliance requirements for accepting and receipting contributions received through an investment account and/or third party to include stock donations. Given my years of professional experience in philanthropy, I found Laura's behavior/comments on the handling of gift processing/receipting/reporting extremely concerning given Laura's years of experience as a fundraising professional to include Laura's almost 6-year tenure as the Senior Director of Development at STC (**Appendix G**). My concern was STC's continued/ongoing acceptance of DAF and IRA donations in exchange for benefits after telling Laura that the practice is improper (a practice Laura implemented during her 6-year tenure working for STC). Additionally, I found it odd how STC recorded its stock donations in its CRM as it is the only organization I have worked for that required the Development team to record/calculate a stock gain/loss and record that as the donor's contribution in their permanent record. This practice for most stock donations at STC increased the donation amount to an amount higher than what STC's stock broker deposited in STC's bank account. For example, nonprofit accounting teams typically advise of and/or provide guidance on gift processing for stock and in-kind contributions as Gift Accounting is a collaborative effort amongst Finance and Development that starts in Development, however it has to translate to the finance department for 990 reporting. Furthermore, gift processing stock and in-kind donations is different for every nonprofit. However, on **March 11, 2024,** James Roemer's response to my email request inquiring about what the business practice has been at STC for recording in-kind gifts in a donors record was, "I don't process gifts so I cannot be of specific STC guidance" (**Exhibit R**). After 3 months of working at STC a gift accounting conversation with James never happened. It was clear to me that James resisted my leadership and Laura supported it. Given the hostile work environment at STC, STC's suspicious business practices, and the District of Columbia's one-party consent rule I audio recorded some of my meetings and conversations with Laura and other STC staff for support. On **April 1, 2024,** my meeting with Laura became intense as Laura would cut me off when speaking condoning the business practices allowed through the former DDO Sarah and for me arguing against it. Laura then decided that she would reach out to Michael Beriss, Senior Financial Advisor at Ameriprise Financial Services Inc who is also a Board Member and Major Donor of STC, for advice on the matters. Prior to us getting on the call with Michael I explained to Laura that I did not believe it to be a clever idea to ask Michael as it created a conflict of interest; I explained to Laura that Michael is one of many STC donors who receives benefits for contributions made through a DAF or IRA. During that conversation of which I audio recorded (**Appendix H**), I interpreted Michael's comments as advising STC on how to evade authorities while protecting the monetary interests of himself and other supporters.

3

strategic recommendations. The incompetence that STC labeled me with really was their own and I often had to highlight that fact because the privilege that was afforded to white staff provided them job security, something I was hoping for. STC's budget process was messy, it did not include support documentation, and it was projected against STC's pastime contribution data of which was inaccurate as I pointed out to STC's leadership several high dollar donations incorrectly recorded/categorized within the past 5 years. Meaning STC had big dollar contributions in categories they did not belong of which falsified how successful the org/fundraisers were or were not as well as boosted their fundraising efforts/performance making it appear as though the white fundraising staff were putting in the work to meet their goals. I believe it was the org's way of deceiving its Stakeholders and authorities. Laura and STC's fundraisers struggled with the budget process; however, it was not Laura or the other development staff members first rodeo at the budget process as they handled the process themselves in the past with support from Sarah; the process was always based on what the fundraisers believe they can raise of which is a standard practice at most nonprofits and should include some analytics. It was very odd to me that the org would go about this process with out a written strategy capturing fundraising areas that will be fully developed, carefully monitored, and frequently reported on through out the year in detail. This would include Expected Campaign Metrics, Expected Annual Metrics for Direct Mail, Acquisition Metrics, Website Metrics, Major Giving Metrics, Donor Relations, Stewardship efforts, and Operations to name a few. It's sad and unfortunate that STC would use a budget challenge to make me appear as incompetent per their Exhibit D knowing how unique it was to STC versus other nonprofits (**Appendix G**). I must have really hurt someone's feelings pointing these things out. None the less, BG worked in the IT department and is STC's CRM expert. BG dictated to the organization how to use and maintain CRM of which should already incorporate those things included in Appendix G. Without it, Laura created privilege for the all white fundraising staff of which included Laura who received annual bonuses. BG's supervisor Brian McCloskey (BM) would refer staff to BG when he received complaints about issues/challenges with the CRM. BG's supervisor BM is the Senior Director of IT. Based on my interactions with BM he was useless when needed to resolve a problem with the CRM; BM was not as knowledgeable in the CRM as BG. As the Director of Development Operations, I had no other choice then to work with BG, someone who was not a director or did not function at that level.

To streamline STC's existing fundraising systems as an effort to increase workflow efficiencies and funds raised, during my weekly operations meetings with Laura I had to plead to her for understanding as she admittedly supported and benefited most from STC's organizational culture. I explained to Laura that working with BG was complicated as he was not customer service focused or friendly and would often challenge or dismiss my strategic recommendations. Interestingly, BG behavior was no secret to STC as Sarah warned me of this during my 2-week training, STC already knew that BG was an issue as Sarah often complained about him as well. Laura's response was as follow, "BG has worked at STC for many years and you're going to need to figure out how to work with him." Laura also suggested that I go out to lunch with BG to

5

get to know him better. I rejected that and explained that I would prefer to keep my relationship strictly professional and that I would rather BG and I have information sharing sessions where he downloads me on the lay of the land (CRM) so that I can be of best support to the development department and a strategic thought partner to him. I also explained to Laura that when working with the fundraiser's I recognized they were unsure of how to interpret donor intent or accurately book funds for reporting purposes based on how they gave their request to me to process a donation. **Laura then said to me that she values what the fundraisers bring to the table more so then I and that I will need to compromise on that if I want to stay with STC.** I at once said back to Laura that was unfair because you cannot sustain your fundraising success if your back-end infrastructure does not adequately support it which by default set's me up for failure as the newly hired DDO. Furthermore, I did not but should have told Laura that her comments were insensitive and felt discriminatory as I am the only black male in a senior management position in the entire organization and the only male on a team full of primarily white women where Laura did not devote as much time to supporting me as she does the ladies on the team. In support of my claims, and interesting enough, not long after our conversation Laura and Joanna Barnhouse the Associate Director of Development, Individual Giving engaged in what I assessed to be an intense email exchange triggered by me where Laura and Joanna went back and forth on how to report a donor's contribution intention (**Appendix K**). Based on the business practices of Laura and Sarah revealed through the data, it appeared to me based on how that data was allowed to be entered in STC's CRM, Laura's overall business conduct, and Laura's handling of staff to include the rehiring of Sarah; Laura's intentions were to create an environment of reasonable doubt/plausible deniability in the event the org underwent an external audit and/or investigation. So much so, that Laura's first 6-month performance review of me was so bias, unfair, and racist that I had to hand write my feedback on it so that she and I can have a discussion. After Laura and my discussion, it was clear to me that Laura would hold things against me that she would never condemn her white colleagues for such as Attitude and Approach, Teamwork, and Communication & Interpersonal Skills (**Appendix P**). By allowing this business to conduct it created confusion yielding an easier effort to manipulate and/or misrepresent fundraising financials, actions, and activities in real time. Or worst, blame it on a new hire like myself or a former STC development employee who voluntarily quit from working under Laura. Again, Sarah quit to. Laura heightened my performance standards over others. On **August 29, 2024,** I met with Laura and several other development colleagues to discuss relationship management and how it needs to translate to CRM. This is the conversation STC discusses in their **insubordination** section of their response of which I audio recorded the entire conversation and can provide it upon request. At the time of this meeting, based on Laura and other Senior Leadership staff treatment towards me, it was noticeably clear that Laura's end game was to make-up and find petty issues to use against me because of my unwillingness to ignore intentional corporate misconduct and fraud. **During our conversation, Laura granted immunity to all fundraisers of which were all white woman along with the Director of Events and Donor Engagement April Powell Harris the other black person on the**

**development team. I asked Laura would that immunity apply to me and if not then how does this all work, Laura said no it does not apply to me got upset and stormed out of the meeting while saying I am leaving this is not effective.** Laura's lack of knowledge/sophistication surrounding high functioning back-end fundraising operations created a false belief that I was insubordinate or aggressive. For me, that was a deflection on Laura's inabilities as the Senior Director of Development who admitted to being a wimp when dealing with certain issues. This can be heard on audio recording Appendix M. Sadly, during most STC events I would be the only staff member on the development team assigned one role while Laura worked through the Events staff to assign multiple roles to others. Laura would place me on elevator duty for an entire event, or Laura would put me somewhere I could not engage with donors or other staff. During this time, I mentioned to Laura that I felt singled out and her response was this may not be the place for you. In arguing against, as well as reporting STC's suspicious and discriminatory business practices, STC retaliated against me resulting in my firing on **September 9, 2024.** On that day I was out of the office on sick leave ailing with Covid and Laura along with the HR Director Lindsey Morris fired me via Microsoft teams. I recorded the entire conversation and had the former President of the American Federation of Government Employees Barbara Jackson listening in to be a witness to my termination. The former president of the AFGE was disappointed with STC's business conduct and is willing to write a statement on what she witnessed.

**Between February and August 2024**, I would meet with BG to make some updates to reports STC used for monitoring fundraising progress to goals and for sending contribution tax receipts. One of those conversations started on the phone, however, BG decided to hang the phone up and walk-up stairs to my workstation and talk about the issue face to face. During this conversation BG continued to challenge and dismiss my strategic recommendations by responding to my request for support by saying, "I don't think Laura would want to do it that way." BG dismissed my strategic recommendations and assumed that Laura, the white woman overseeing my department, and I had not communicated prior to me reaching out to him. I kindly replied to BG, "as the Director, I will let you know if Laura is not ok with something I'm recommending." BG's behavior became irate because of my statement, BG then yelled at me so loud that two of my colleagues sitting on the opposite side of my workstation heard it and reported it to Laura. I too reported it to Laura at once and followed up the very next day with an email to document the incident on paper (**Appendix L**). Laura eventually got HR involved, however, the Director of HR and Laura both recommended that I do not bring it to the attention of BM. Well, on **March 7, 2024,** Laura scheduled a meeting with BM and I to discuss some challenges we were having with CRM functionality; however, BM took that opportunity to lash out at me for the incident between BG and I. BM became so irate that he yelled at me, pointed his finger at me as if I were a child, stood up out of his seat attempting to intimidate me and proceeded to yell at me before storming out of Laura's office. I at once explained to Laura that I believe BM's issue with me is not that I am intelligent but that I am black. I explained to Laura that BM is extremely polite, friendly, and helpful to every white woman on our team yet has never spoke to me or sat to speak

with me since hired as the new DDO. And that BM would help Joanna and the ladies on her team whenever they reached an impasse, however, he got confrontational with me after only hearing what I would assume to be BG's side of the story since HR and Laura asked that I not bring it to BM's attention. To ensure I captured every detail, I audio recorded the conversation with BM, Laura, and I (**Appendix M**). After several unprofessional encounters with Senior Leadership and Senior Management at STC in such a brief period, it was clear that Laura nor STC senior leadership staff were fully accepting of Black male leadership / culture and were going to continue to resist my strategic recommendations and continue the inequitable treatment they imposed. That treatment was very obvious and witnessed while attending the 2024 Tessitura Learning Center Conference by Christie Coleman (Database Manager at Irving S Gilmore International Piano Festival), Dhalia Kang (VP, Finance at Tessitura who participated in the people of color affinity group sessions where we all discussed workplace issues such as racism, training, etc.), Stanislas Bell (Manager Visitor Services at CMHR), Randal Herndon (Website Manager at Arizona Science Center who was granted 2 extra days to stay at the conference to connect with other professionals; I gave Randal a tour of STC's Harman Theatre), Angela Studley (Tessitura Administrator at Arizona Science Center), and Valentino Peacock (Manager of Data and Operations at Detroit Opera) who all were concerned that other STC employees attending the conference did not speak to me nor attend any of the workshops with me. I shared with these individuals that I started a Microsoft Teams chat group for STC staff to stay in touch while attending the first day of the conference and that no STC employee responded to that message until the next day. I was the only STC employee required to be at the event on the day it started. Additionally, during this conference people were snorting cocaine on the elevators, getting so drunk that they needed an escort to their rooms, and smoking weed outside on the waterfront at the Gaylord. With all that said, I had a really great time attending the 2024 TLCC event of which STC spent over $1,500 for me to attend and did nothing with the information or connections I acquired from attending the 4-day conference. This made it more evident to me that STC's wasteful spending was potentially being financed through corporate misconduct and other fraudulent business practices.

**State Registration Violations:**

**Date / Time Period – Between May and August 2024,** Laura asked me to provide details to one of STC's consultants Labyrinth Inc – nonprofit compliance experts, who filed STC's charitable state solicitation registrations yearly. When accessing Labyrinth's client portal, I discovered that STC was out of compliance with several State's and that Labyrinth needed information from STC to become compliant. When reviewing the information needed by Labyrinth, I recognized that there was information that I as a development professional did not have answers/access to and needed to work with Laura to learn if she had the answers or could point me in the right direction. Laura could not help and was completely unaware of how to answer the questions in the client portal of which concerned me as she handled this effort annually in collaboration with Sarah, former DDO prior to my hiring. Laura eventually scheduled a meeting with James

8

Roemer the Senior Director of Administration, her, and me to review the information needed by Labyrinth. James openly admitted that he resisted accessing the Labyrinth portal, and that it is work that he does not want to have to do. However, Laura was able to convince him to look at it when he had a chance. I Audio recorded the entire conversation (**Appendix N**). Post the meeting, I followed up with Laura and James often so that the org would not face any penalties for soliciting donations in states where it did not have state registration to do so. During this time, I learned of one question in the portal STC intentionally omitted details for. That question was, list any staff, board, or associates who receive vendor payments. While working for STC I became aware of several board members whose company's received vendor payments, yet Laura and James omitted that detail. I learned that JM Zell Partners aided STC with the sale of a property, Jose Andres aided STC with catering at events, and Board Member Emily Lenzner may own or partner with a catering company by the name of Versatile Foods who also received vender payments from STC for an event. In **August 2024**, I sent one final email to Laura and James to learn if they were completely sure that we collectively answered all questions honestly and accurately and I do not recall Laura ever replying (**Appendix O**). On **September 9, 2024**, Laura fired me without me sending the information to Labyrinth. Based on Laura and Sarah's intentions for STC, I take it that Laura may have hired Sarah back so that STC could continue business as it normally did prior to my hiring omitting that information or blatantly falsify it. In addition to the state registration violations, STC intentionally did not safeguard its donor's credit card information allowing years of credit card details and other sensitive information of donors filed in storage boxes on site un-redacted (**Appendix Q**).

**STC's decision to terminate Complainant's employment was based solely on his inappropriate conduct and performance deficiencies.**

STC has a comprehensive record of Complainant's inappropriate, error-filled, argumentative, and often insubordinate conduct and performance deficiencies throughout the entirety of his brief tenure with STC. A series of conflicts that Complainant had with his supervisor, within his department, with staff in other STC departments, and with parties external to STC are a testament to STC's patience and willingness to assist Complainant. His misconduct, however, culminated with STC's reasonable decision to discharge Complainant. Because STC was unaware Complainant had reported any perceived violation of the law, his unsatisfactory conduct and performance were the only contributing factors underlying STC's termination decision.

*Incompetence*

STC hired Complainant as a Director of Development Operations in January 2024. Most of Complainant's responsibilities involved managing and analyzing donor data using STC's Customer Relationship Management ("CRM") platform, Tessitura. Although Complainant had not worked previously with Tessitura specifically, he was hired because he indicated having experience working with comparable CRMs in the development operations field. STC provided Complainant with training and support for utilizing Tessitura, including approving paid training and encouraging his involvement in a local group for Tessitura users in the arts community. At the Director level, STC expected Complainant to have mastered data management, basic fundraising principles, and team collaboration with other departments without significant oversight from leadership.

Complainant, however, struggled with his performance from the outset. He consistently exhibited a limited understanding of basic finance and accounting principles otherwise requisite for a Director-level employee. See Exhibits A and B. As early as February 2024, Complainant's disruptive and argumentative conduct, linked with his inability to perform his job, was apparent. See Exhibit C. As Marco Dimuzio, a Senior Accountant in STC's Finance Department, reported to Lindsey Morris in STC's Human Resources ("HR") Department, "I am okay with providing the information that I know about accounting practices and procedures but having to then put up with all [Complainant's] arguments and frustration against the information I provide is odd." Id. Ms. Willumsen learned that Complainant had been routinely miscoding data in Tessitura, which was the CRM platform within which Complainant worked every day for approximately nine months, creating errors which "could have been avoided by following the fiscal year-end steps provided" to Complainant. See Exhibit D. Complainant's consistent oversights and errors indicated poor attention to detail and overall lack of experience for the Director of Development Operations role, despite repeated attempts by STC to train and assist him.

**Commented [P1]:** I was never made aware of any misconduct; however, I believe that in an attempt to control the narrative my supervisor and other STC management and leadership staff staged emails that implied misconduct on my part or that I was difficult to work with refusing to accept STC as it is. Truth is, I was much more knowledgeable in the work (back-end operations) then my supervisor and a lot of my peers. It was considered misconduct when I would often bring up in our weekly team meetings that there is no fundraising strategy to build a back-end on. No annual work plan was ever shared with me which is what I would use to be proactive in my work and ensure the appropriate balance of information being entered into Tessitura. Essentially, they wanted me to tuck my tail in and accept the organizat[ ... [1]

**Commented [Tb2]:** This is a lie, STC was aware of me reporting the violation of the law and it is why Laura, and I had a conversation about it (of which I audio recorded where Laura herself mentions it) that led to Laura contacting Board Member and Major Donor Michael Beriss for advice on how to appropriately handle his tax receipts. However, Michael is someone who directly benefited from this business conduct and Laura was also made aware of that before she called him.

**Commented [Tb3]:** This is not true. The only training that was provided to me was given by Sarah Pultz the previous Director of Development Operations of which she did not get to cover everything in addition to Sarah having to skip over items because she couldn't follow her own work. Sarah left behind a lot of instructions that she prepared of procedures and processes that I had to continue in her absence that did not work as written. I can provide those upon request as I still have the binder. Sarah also gave me access to several links through Tessitura where I could learn on my own. Those online sessions did not get into the [ ... [2]

**Commented [Tb4]:** There was no oversight from leadership, specifically my direct supervisor Laura. She was incompetent about the infrastructure she over saw for 6 years prior to my hiring as she was unable to adequately support or advocate for me or the data management challenges her department had been experiencing prior to my hiring. Some basic fundraising principles that Laura did not implement prior to my hiring that I had expected to already be in place were as follow: Showing appreciation and stewardship through timely acknowledgements and impact reports, or ensuring vendors are paid on time s[ [3]

**Commented [Tb5]:** I believe my performance evaluation of which for STC exceeded the 90-day window that most corporations follow for determining if they will maintain a new hire was racist and unfair as I was held to higher standards then my white female colleagues. Additionally, STC waited over 6-months to evaluate my work performance, and the overall evaluation of my performance as of 7.31.2024 was Satisfactory - Performance meets defined performance standards, objectives, and key tasks. Performance could be improved in some areas. To that end, typically the performance evaluation is the opportunit[ ... [4]

| Page 1: [1] Commented [P1] | Public | 1/1/1900 12:00:00 AM |
|---|---|---|

I was never made aware of any misconduct; however, I believe that in an attempt to control the narrative my supervisor and other STC management and leadership staff staged emails that implied misconduct on my part or that I was difficult to work with refusing to accept STC as it is. Truth is, I was much more knowledgeable in the work (back-end operations) then my supervisor and a lot of my peers. It was considered misconduct when I would often bring up in our weekly team meetings that there is no fundraising strategy to build a back-end on. No annual work plan was ever shared with me which is what I would use to be proactive in my work and ensure the appropriate balance of information being entered into Tessitura. Essentially, they wanted me to tuck my tail in and accept the organizational culture, or in some instances Laura would nicely ask me to quit by suggesting that STC may not be the place for me. I also believe that this statement contradicts the performance evaluation I was issued in July 2024. To that end, I often was held to higher expectations and standards of professionalism by Laura then my white colleagues in and outside of the development team.

| Page 1: [2] Commented [Tb3] | Tyevontay blackman | 1/1/1900 12:00:00 AM |
|---|---|---|

This is not true. The only training that was provided to me was given by Sarah Pultz the previous Director of Development Operations of which she did not get to cover everything in addition to Sarah having to skip over items because she couldn't follow her own work. Sarah left behind a lot of instructions that she prepared of procedures and processes that I had to continue in her absence that did not work as written. I can provide those upon request as I still have the binder. Sarah also gave me access to several links through Tessitura where I could learn on my own. Those online sessions did not get into the depth of the 3-week training course STC alleges it paid for. Please note that I would not have received the 3-week training if it had not been for a scholarship I applied for through Tessitura and won which covered the expense of the training so that STC did not have to pay for it. That was a 3-week training course that I passed and received a certificate for satisfactorily completing all required coursework, assignments, and hands-on exercises for Hands-On Fundraising issued May 2024. So, my first official training of Tessitrua did not happen until May 2024 5-months after STC hired me. And after having to put out so many fires that existed prior to my hiring, it was clear to me that Laura and others were not as interested in setting me up for success by providing me adequate support as they did Sarah Pultz who was promoted to her position without any development operations experience. Sarah worked in the box office when Laura was hired by STC and Laura gave her a chance because she was a bubbly white woman who knew how to use Tessitura better than most STC employee's. A lot of information from the 3-week training was not shared with me by Sarah during the two weeks she trained me before she left STC. As well as none of that was shared with me by the tenured Database Administrator Brian Grundstrom who administered, configured and advised staff on how to use Tessitura. Worst, I received minimal support from Brian Grundstrom when encountering challenges with system functionality, navigation, or code definitions of which explain what the codes/data in the system drop downs represent so that a newbie such as myself is setup for success when providing support to staff. Brian's lack of support was so bad that I printed all of the emails I sent to Brian requesting his assistance that he did not respond to, and took them with me to the 2024 Tessitura Learning Center Conference (a 4-day social event) and had the onsite client success support team answer every last one of them for me as well as provide me with follow up emails so that I have documentation to show how much time it took for me to resolve tessitura challenges that could've been resolved with support from Brian Grundstrom.

| Page 1: [3] Commented [Tb4] | Tyevontay blackman | 1/1/1900 12:00:00 AM |
|---|---|---|

There was no oversight from leadership, specifically my direct supervisor Laura. She was incompetent about the infrastructure she over saw for 6 years prior to my hiring as she was unable to adequately support or advocate for me or the data management challenges her department had been experiencing prior to my hiring. Some basic fundraising principles that Laura did not implement prior to my hiring that I had expected to already be in place were as follow: Showing appreciation and stewardship through timely acknowledgements and impact reports, or ensuring vendors are paid on time so that the nonprofit avoids any extra fees in addition to receiving poor/low quality services because of its reputation of not paying its vendors on time. I had received multiple vendor

payment requests for things like catering services for an STC event that were outstanding for over a year not been paid in addition to receiving complaints from upset donors for not receiving their contribution tax receipt for a donation they made in the early months of Calendar year 2023. A clear indication that STC was violating IRS tax laws by not issuing contribution tax receipts for all donations of $250 or more. And the only teams I had to collaborate with outside of Development were Finance, and Marketing; Laura participated only when she was somewhat forced to. Meaning there were instances where I had to inform Laura that contributions processed by the Marketing team were not being processed correctly during and prior to my hiring and that the Senior Director of Marketing had not a clue of what goes into the work and often would refer me to his subordinate staff of which none of them worked at the Director Level and clearly lacked the knowledge of what's required when processing donations resulting in the development department, me specificaly, improperly receipting those donations with my signature on the receipt as the signing official at STC and issuance of benefits to donors who should have those benefits declined due to the vehicle used for making their donation. To that end, Laura alleged that she was unaware of who advised the marketing team on gift processing prior to my hiring and was unable to provide any support to assist or ensure my success in working with them. The best that Laura did for me on occasions was back me on some of the compliance issues I highlighted with gift processing such as the importance of accurately capturing the legal entity making the donation and determining what benefits are available to donors based on the form of payment of which they used to make the donation. What I needed Laura to do was meet with her equal, the Senior Director of Marketing and have discussions at their level so that it trickles down to his staff and reflected in those gift entries. As Executive's, I wasn't sure how Laura and Neal would allow this knowing the high-risk factor of it leading to incompliance, misrepresenting financials, fraud, and so much more.

| Page 1: [4] Commented [Tb5] | Tyevontay blackman | 1/1/1900 12:00:00 AM |
|---|---|---|

I believe my performance evaluation of which for STC exceeded the 90-day window that most corporations follow for determining if they will maintain a new hire was racist and unfair as I was held to higher standards then my white female colleagues. Additionally, STC waited over 6-months to evaluate my work performance, and the overall evaluation of my performance as of 7.31.2024 was Satisfactory - Performance meets defined performance standards, objectives, and key tasks. Performance could be improved in some areas. To that end, typically the performance evaluation is the opportunity where STC determines if it will fire or keep me if it truly believed that I had a limited understanding of basic finance and accounting principles. Instead, STC continued to engage in what the average professional would consider to be wasteful spending for a nonprofit if it truly believed that. Additionally, STC continued its business with me by increasing its investment in me with an 8.5% pay increase in August 2024 boosting my salary from $90k to a little over $97k. Why not use the evaluation as grounds and/or the opportunity to terminate my employment? Instead, STC decided to keep me as an employee and increased my pay in hopes that I would stop mentioning the donor fraud STC's Leadership team supported and never reported after being informed of it taking place. In STC's exhibit A, the org is attempting to make it appear as though I have limited understanding of how to process and record stock donations. Please be advised that no one nonprofit processes stock donations the same. So, it is expected that I'd be advised on the orgs business practices for such, as well as I ask every Finance and Accounting team what their business rules are for entering stock donations where they typically provide me that detail. To that end and in addition to, the Council of Advancement and support for Education (CASE) of which provides guidance on reporting standards and management guidelines for educational fundraising states that Gifts of closely held stocks that exceed $10k in value should be reported at the fair market value placed by a qualified independent appraiser as required by the IRS or CRA for valuing gifts of stock that are not publicly traded. In the United States, the institution may obtain the appraiser's valuation figure from "Noncash Charitable Contributions", IRS Form 8283, which the donor must usually provide for the recipient's signature. Gits of closely held stock of $10k or less may be valued at the per-share cash purchase price of the most recent transaction. Normally, this transaction is the redemption of the stock by the corporation. If no redemption has occurred during the reporting period, an independent certified public accountant (CPA) who maintains the books for the corporation is qualified to value its stock. All methods suggest that guidance is required from an

accounting professional making processing contributions of stock an accounting function that is shared amongst Development professional's. With this example, STC is manipulating the reality that I don't understand what's required to properly process a stock donation after they had already approved several stock gift entries processed by me and after I had a virtual meeting with Marco where he and I agreed on getting rid of the excel sheet that James required I use. There were emails between Marco, Brian Grundstrom and I where the conversation Marco and I had was mentioned. Unfortunately, I do not have copies of those emails but they should definitely exist in STC's servers.

In STC's exhibit B, the org is also attempting to manipulate/highlight what it assesses to be my limited understanding of accounting principles while in the same example affording leniency to the white women staff members who cause the issue to begin with. One of the many issues that made it appear as though I struggled with understanding gift restrictions / adjustments was the fact that Laura did very little to ensure that Sarah Pultz trained me on the process for STC. Instead, Sarah entered all FY25 Restrictions herself preventing me from learning how to use Tessitura for handling such. I learned after the fact that I had access to some Database Administrator functions such as system configuration of which would allow me to establish Campaign codes. The caveat to that is, based on Tessitura's functionality when establishing a Campaign code, be it restricted or not, it has to be linked to the appropriate Fund Code of which Fund codes are established and controlled by Finance and Accounting Teams at all nonprofits. So, although I did know how to process the adjustment but did not know where in that to remove the Fiscal Year restriction due to Tessitura's bulky infrastructure / antiquated functionality and lack of training on such (to make matters worse my direct supervisor Laura had not a clue as well), I was very aware of what goes into making adjustments to gift entries to include its impact on fiscal year recording/reporting. And although Marco may have been unaware of how to remove the restriction when I asked, I'm not sure why me asking him would upset him. Marco could've easily suggested I contact Brian Grundstrom of which I did after speaking with him. It's a fair question for a tenured employee like Marco who oversees all accounting data on behalf of the organization. And as provided in my job description by STC Director of HR, it's my job to work with Finance - Marco, and the Database Administrator on these matters hence the reason why I sent the email STC provided in its exhibit B. I reached out to Marco first because the matter impacts accounting most not to frustrate him or to save face, and not because I don't understand how a fiscal year relates to the subledger/gl. When doing the adjustment, the system was issuing an error message kicking it back because I did not know where to remove the restriction of which those error messages are established by the Database Administrator and are considered business rules. System configured business rules help maintain data integrity preventing staff members like me and others from misrepresenting a donor's intention or the fundraising actuals of which are budgeted and then projected throughout the year in fundraising progress reports to the Executive team by me. Also, in the details provided in STC'S exhibit B, Marco never once complained on Sarah Counts who is the reason why the adjustment to the gift entry requiring the restriction be removed exits to begin with. In my weekly meetings with Laura one of the many challenges that I would mention to her was the issue of the Front-line fundraisers not knowing how to effectively communicate the intentions of the donor relationships that they manage or how to effectively manage them as they also partner with Laura to establish the fundraising budget / goals that is approved by the Board. For example, in Exhibit B I was the one who pointed out to the relationship manager Sarah Counts that the donor had not made an FY24 gift of which caused her to reach back out to the donor which resulted in her requesting I adjust the entry. The pressing need is to meet the FY24 fundraising goal and the only reason why someone in Sarah Counts position wouldn't consider such is because herself and all of the other frontline fundraising staff were not being held to a performance standard of meeting the fundraising goals they set with Laura. They would keep their jobs no matter if they performed horribly or not.

In exhibit C, the org appears to have staged another email to make it appear as though my conduct is inappropriate. Yes, at this time I was only two months in and there were times where Marco, and I would speak virtually as he worked 100% remote where he and I were casual with one another, and I did ask him why is it that staff are not trained on institutional requirements such as how to submit out-of-pocket expense for

reimbursement during onboarding. I also provided him examples of how I managed such efforts at other nonprofits where I would collaborate with HR, IT, and Finance on administrative processes that support employee success and/or require a cross-departmental approach for efficiency but lives in onboarding of which at most businesses is an HR responsibility. The issue was not only that the staff were not trained on how to submit out-of-pocket work-related expenses for reimbursement, they also were confused on how to expense them based on the expense budget **they** set in partnership with Laura. And to be fair, it truly was all over the place as there were duplicate expense codes and inconsistency over the years in the use/reporting of such making it difficult to refer to previous year reports for guidance. This was even the case for Laura where I sent an email to her regarding a purchase she made where I highlighted there was not an expense line for the purchase, and she advised I put it wherever there is budget. I may also have an audio recording where Laura speaks about her disdain for the process set by Finance and Accounting and its coding naming convention inconsistencies.

In exhibit D, the org appears to have staged another email to make it appear as I have a performance deficiency. Ironically, STC did not provide a copy of the gift log of which determines if the $6k gift from Dimick is for FY24 or FY25 of which is told to me by Rachel the relationship manager who maintains all communications with said donor so that I am able to record it in Tessitura, or any of the procedures I put in place for tracking and notifying the frontline fundraiser's of donations that have come in so that they can affirm its allocation for entering the gift in the donors record and to also track their fundraising actuals to goals. Although the email in exhibit D is from my direct supervisor Laura, it's her working with her colleagues to stage emails to make it appear as though I have performance deficiencies and are unable to follow the guidance provided for fiscal year end gift processing. It's probably why they didn't provide any documentation that shows how the Dimick gift was handled from inception to completion of which would and should include the actions taken by the frontline fundraiser who is the relationship manager. Rachel is responsible for maintaining her revenue area; she is the one who prepares the support data that I use to update the quarterly fundraising projections report. I copy and paste what Rachel provides me into the projections excel file so that senior leadership staff won't say that I made a mistake. Laura making it appear as a mistake that I made was her again providing privilege to white staff more specifically the white woman in my department and penalizing me for it. Laura had the tendency of classifying it as disrespect when I speak on / point it out. In this exhibit, Rachel explains to James why there may be a discrepancy with the reporting she maintains, yet James and Laura are blaming the miscoding on me because it's easy to do as I was the one to enter it but based on what was communicated to me by the relationship manager.

### Insubordination

In addition to his simple incompetence at basic elements of his job, Complainant was insubordinate and resistant to Ms. Willumsen's efforts to guide him in the right direction. Ms. Willumsen provided Complainant with examples of his resistance to following reasonable directions and requested that he improve his workplace behavior. See Exhibit E. Ms. Willumsen thereafter reiterated her concerns in Complainant's six-month performance evaluation because Complainant exhibited undetectable improvement. See Exhibit F. Ms. Willumsen rated Complainant "Marginal"—defined as "not meet[ing] all expected requirements of the position on a regular basis and is not satisfactory in the case of a long-term employee"—for three of the most critical factors: Attitude & Approach, Teamwork, and Communication & Interpersonal Skills. Id. Ms. Willumsen explicitly stated in the performance evaluation that "at times [Complainant] comes across as aggressive or defensive. He has raised concerns about STC's financial and database systems repeatedly . . . [h]is tendency to make negative assumptions about colleagues' work or expertise conveys a lack of respect, which makes solving problems more difficult." Id. Ms. Willumsen believes that Complainant complained generally about Tessitura and his colleagues as a baseless diversion from his performance deficiencies and basic misunderstandings of how to perform his job properly.

In the weeks leading up to STC's termination decision, Complainant's insubordination worsened. For instance, it was pattern and practice for employees in the office to attend meetings in-person, but Complainant unilaterally and without reason refused to do so. See Exhibit G. Complainant's defiance and insolence became untenable, as demonstrated by Ms. Willumsen's two comprehensive summaries shared with HR in September 2024 about her challenges with Complainant's performance and conduct. See Exhibits H and I. For example, as Ms. Willumsen noted, Complainant had reached the point of outright opposition and contradiction to her instructions:

I ended our meeting with Shelagh and April on Thursday prematurely because [Complainant] contradicted what I said to the point that the meeting was not productive. This is unprofessional behavior for a staff member with their boss. The day before we had a heated call because I told him that he had to solve problems rather than send colleagues lengthy emails about why he couldn't because either they or IT needed to solve the problem. He then repeated what he's said to me often, "You don't support me." See Exhibit I.

**Commented [Tb6]:** In exhibit E, it appears that Laura is attempting to highlight / allege inappropriate conduct from me. In reading the email it's clear that Laura is using the email I sent her as an opportunity to control her narrative while bashing me for something that I had been notifying her of for months; that there is a talent issue with staff hired before my time and that I'm sharing my knowledge with them as well as asking all the right questions to build trust and to determine where the knowledge gaps need to be filled. However, me sending the email to Laura was so that I can continue to document these performance deficiencies as they impact my success. She staged her reply so that it appears as though my approach is inappropriate and that I should have one-on-one conversations with the staff instead. I explained to Laura that as the only staff working in development operations doing everything on my own, not even with help from her, having meetings about every little thing pushes my work back and becomes time consuming when those things can be quickly resolved via email. To protect her personal business interests and the results of her business conduct, Laura wanted me to interact with staff face-to-face so to make them feel comfortable about their knowledge gaps as if I was making them feel uncomfortable in email. Laura used racist umbrella words often when I pointed out the mistakes of the white staff who were paid well and kept their jobs for years after all of the issues that I uncovered with their work that resulted in incompliance, fraud, and misrepresentation of financials, such as aggressive or disrespectful. The only reason why I did not let up on this and constantly reite... [11]

**Commented [GU7]:** In exhibit G, it appears that Laura is staging another email. The statement indicates that I refused to attend the meeting when I did attend. Laura made it an issue for me to work from my desk, so I got my fat ass up and went down and joined the team in the conference room. It was clear to me based on Laura's email that she was being petty and looking for any little thing to hold against me. So much so that she would lie in this response and say that I refused to go to the meeting. Laura had gotten so fed up with me speaking against issuing improper receipts with my signature on them, especially to donors who donated via a donor advised fund or IRA who received benefits such as Gala tickets or Membership that she would hold mistakes against me that she would never hold against the white staff to include the former Director of Development Operations Sarah Pultz who left STC for a new job with their bills unpaid, donors not acknowledged for months, incorrect donation amounts in donor's records, and that's just to name a few. Sadly, to this day Sarah has her job back at STC even after getting fired from Folger, the company she quit STC to work for. Clearly, Laura was looking for any reason to appear as though she had to reprimand me so that it be easy for her to get away with fraud and discrimination, as well as hire Sarah Pultz back so that they can continue business as they did prior to my hiring. Here's the kicker, for these team meetings Laura provided special accommodations to two of the white staff who had worked for STC for over 3 years due to reaso... [2]

## Combative with colleagues

Complainant was likewise argumentative and disrespectful toward his colleagues in other departments during his employment with STC. As explained above, Mr. Dimuzio filed with HR a complaint about Complainant in February 2024, which was barely one month after Complainant Jake McCord-Wolbert Regional Investigator January 10, 2025 Page 5 onboarded, because Complainant was argumentative and unprofessional toward the IT and Finance Departments. See Exhibit C. Approximately one week before STC terminated Complainant's employment, Mr. Dimuzio shared with HR that "the amount of extra work and negativity [Complainant] has created at STC is unbearable." See Exhibit J. Mr. Dimuzio was reasonably frustrated with Complainant shirking his duties and offloading responsibilities assigned to Complainant onto other departments. See Exhibit K. Senior Director of Administration, James Roemer, also shared concerns with HR about how Complainant mistreated Mr. Dimuzio. See Exhibit L. STC staff members in the Marketing, IT, and Finance departments had communicated to Ms. Willumsen directly to share their unwillingness to work with Complainant.

Complainant also exhibited disruptive and unprofessional conduct as a representative of STC before third parties, which reflected poorly upon the organization. For instance, at a Tessitura user group meeting with approximately 40 attendees total from the local arts community, STC learned from a non-STC attendee that Complainant was dismissive of both the CRM platform and other participants during the call, as she stated that Complainant "didn't seem to want to listen to anyone if they disagreed with him." See Exhibit M. Complainant also erroneously stated to a third party that he was not approved to attend a Tessitura-related event in a manner that reflected poorly on STC. See Exhibit N.

**Commented [8]:** In exhibit C, it appears that this complaint was made after Marco and I had a conversation that covered several challenges I was encountering that required I work with he and Brian Grundstrom to resolve. It also appears that Marco maybe upset working with him to learn why their established procedures were created challenges for the staff. Marco speaks to the reimbursement policy for staff and that I wasn't properly trained. Here's the issue with that, he's correct, I wasn't properly trained and after 6 years of leading the development department and overseeing this effort Laura was challenged by it as well. I asked Marco why staff in my department did not now/struggled with the process such as Joanna and Laura herself. What Marco is leaving out is that I suggested, as my job description requires, that we adjust the onboarding process to include this in the new hire training. Marco agreed that it sounded like a good idea, but the tone of his voice made me feel like he didn't feel that it was a challenge for him and I discuss. I only ran it passed him because he works in Administration of which consist of the HR department. The idea I suggested also created efficiencies allowing for new hires to hit the ground with running. Marco also manipulated a question I raised to him by stating it incorrectly (Marco said that I asked why they in accounting cannot flag incorrect contribution tax receipts to a donor). To give you some background before I state the question I actually asked; just two months in working [...] [3]

**Commented [9]:** In exhibit J, Marco is speaking to exhibit K where it appears that the Director of HR was upset that I asked about the onboarding process and if there was a way to soak up some of the administrative process during it. I found it odd that an organization that should be financially conscious in how it spends its money would not advise staff of their work-related responsibilities that impact finances. For example, if you gone give a staff member a company credit card I expect that you will let them know all that they need to use it and to avoid any risk (STC was so loos with their processes that Cierra Culbertson, the Events Manager who promoted from Development Coordinator took the corporate credit with her on a family vacation for a week and lost it. Laura send me a text message on my perso [...] [4]

**Commented [10]:** In exhibit M, it appears that James and Brian McCloskey came together with an associate of thiers to stage an email in attempt to make me appear as having inappropriate conduct. During the DC 1ug group virtual discussion, there were a host of Tessitura users from the east cost speaking up about their challenges with the software. I spoke only when allowed or if the floor was open for all to speak. I was very candid in my assessment of the systems functionalities and compared it to other sophisticated systems to explain my struggles with it. Essentially I kept it real as that's what the discussion was hosted for us to do. I found it very odd that someone on the call who does not work for Tessitura was so offended by my candidness that they would reach out to my employer [...] [5]

**Commented [11R10]:** Exhibit M is illegible, I am unable to respond.

| Page 2: [1] Commented [Tb6] | Tyevontay blackman | 1/1/1900 12:00:00 AM |
| --- | --- | --- |

In exhibit E, it appears that Laura is attempting to highlight / allege inappropriate conduct from me. In reading the email it's clear that Laura is using the email I sent her as an opportunity to control her narrative while bashing me for something that I had been notifying her of for months; that there is a talent issue with staff hired before my time and that I'm sharing my knowledge with them as well as asking all the right questions to build trust and to determine where the knowledge gaps need to be filled. However, me sending the email to Laura was so that I can continue to document these performance deficiencies as they impact my success. She staged her reply so that it appears as though my approach is inappropriate and that I should have one-on-one conversations with the staff instead. I explained to Laura that as the only staff working in development operations doing everything on my own, not even with help from her, having meetings about every little thing pushes my work back and becomes time consuming when those things can be quickly resolved via email. To protect her personal business interests and the results of her business conduct, Laura wanted me to interact with staff face-to-face so to make them feel comfortable about their knowledge gaps as if I was making them feel uncomfortable in email. Laura used racist umbrella words often when I pointed out the mistakes of the white staff who were paid well and kept their jobs for years after all of the issues that I uncovered with their work that resulted in incompliance, fraud, and misrepresentation of financials, such as aggressive or disrespectful. The only reason why I did not let up on this and constantly reiterated the issue to Laura was because of its impact on my ability to be successful. Not addressing the talent issues created hardship for me cross-departmentally, duplicative efforts, and worst of all it directly affected the dynamics of our working relationships because staff had gotten away with lacking for so long that they were feeling called out by me because I knew my job well enough to do so and be proactive and plan for work on the horizon. The email in this exhibit is me doing just that, however, Joanna knew of this information in my first several months on the job as she forwarded me London Trip donations to process yet waited until I asked to share it. She and many other STC staff were not forthcoming with information or support and it was obvious that it was intentional because I was the only person who could and would call out the issue. I needed the detailed breakdown of this fundraising effort so that I could issue a proper contribution tax receipt post the event. In the email from Laura, she intermingles the understanding of what goes into the work because she too does not know. Laura was under the impression that I needed to meet with Joanna to discuss revised dropdown menus in Tess. Joanna had been with STC for over 2 years, and it was obvious based on the active and inactive dropdown codes that existed / that STC used prior to my hiring for Joanna's work, that Joanna, Sarah Pultz, nor Laura had a clue of what goes into establishing such. For me, exhibit E of Laura's email was to save face because she realized the value of the knowledge I had and it being a bad reflection on how much she does not know as well as the overall impact these talent deficiencies have on data integrity and financial reporting. All of which I was responsible for preparing and distributing based on details shared with me from those managing donor relationships / responsible for raising money. Additionally, my evaluation was done after this email was sent. Laura using terms when describing me such as aggressive without any evidence of me actually being aggressive has always felt like a deflection from her lacking the knowledge required to ensure that her staff are not placing her or the organization at risk of enforcement or worst loosing donors. Often, I believe Laura's intentional mischaracterizations of me being aggressive and not assertive was because I was highly confident in my my knowledge of the job and that I did not make excuses for staff who I believe were granted privilege and grace to make as many mistakes as the wanted to and still keep their jobs including Laura herself.


In exhibit F, it appears that STC is attempting to leave key information out. I do not see the initial evaluation. What STC attached is the evaluation of which Laura changed some of her scores after our conversation. To that end, Laura's first 6-month performance review of me was so bias, unfair, and racist that I had to hand write my feedback on it so that I have my talking points when we meet. After Laura and my discussion, it was clear to me that Laura would hold performance standards against me that she would condemn our white colleagues for such as Attitude and Approach, Teamwork, and Communication & Interpersonal Skills. By excusing the behavior from the white staff it created space for Laura and other tenured STC staff to stage communications and omit documentation established by me so that it appears on paper that I am the issue, and worst blame it on new hires or former STC development employees who for the most part voluntarily quite from working with Laura. I would've quiet, I just couldn't afford to. Laura heightened my performance standards over others. On August 29,

2024, (this is the meeting Laura refers to where she met with me, Shelagh, and April of which I audio recorded the entire conversation and can forward that to you so that you can hear it and understand the extent STC will go to make me appear as displaying inappropriate conduct) I met with Laura and several other development colleagues to discuss relationship management and how it needs to translate to Tessitura. At the time of this meeting, based on Laura and other Senior Leadership staff treatment towards me, it was noticeably clear that Laura's end game was to make-up and find petty issues to use against me because of my unwillingness to ignore intentional corporate misconduct and fraud. During this conversation, Laura granted immunity to all fundraisers of which were all white woman along with the Director of Events and Donor Engagement April Powell Harris the other black person on the development team. I asked Laura would that immunity apply to me and if not then how does this all work, Laura said no it does not apply to me got upset and stormed out of the meeting while saying I am leaving this is not effective. Laura's lack of knowledge /sophistication surrounding high functioning back-end fundraising operations created a false belief / impression that I at times am insubordinate or aggressive. For me, that was a deflection on Laura's inabilities as the Senior Director of Development who admitted to being a wimp when dealing with certain work-related issues. This can be heard in audio recording Appendix M.

| Page 2: [2] Commented [GU7] | Guest User | 3/28/2025 2:43:00 PM |
| --- | --- | --- |

In exhibit G, it appears that Laura is staging another email. The statement indicates that I refused to attend the meeting when I did attend. Laura made it an issue for me to work from my desk, so I got my fat ass up and went down and joined the team in the conference room. It was clear to me based on Laura's email that she was being petty and looking for any little thing to hold against me. So much so that she would lie in this response and say that I refused to go to the meeting. Laura had gotten so fed up with me speaking against issuing improper receipts with my signature on them, especially to donors who donated via a donor advised fund or IRA who received benefits such as Gala tickets or Membership that she would hold mistakes against me that she would never hold against the white staff to include the former Director of Development Operations Sarah Pultz who left STC for a new job with their bills unpaid, donors not acknowledged for months, incorrect donation amounts in donor's records, and that's just to name a few. Sadly, to this day Sarah has her job back at STC even after getting fired from Folger, the company she quite STC to work for. Clearly, Laura was looking for any reason to appear as though she had to reprimand me so that it be easy for her to get away with fraud and discrimination, as well as hire Sarah Pultz back so that they can continue business as they did prior to my hiring. Here's the kicker, for these team meetings Laura provided special accommodations to two of the white staff who had worked for STC for over 3 years due to reasons un-related to work. Olivia was allowed to work from home because she lived in Virginia and so Laura was considering Olivia's commute. Sarah Counts was allowed to work from home because she had a child and STC did not pay her enough to afford childcare. Why would it hurt for me to attend virtually so that I can catch up on work this one day? As I explained to Laura, I am a one man shop and for Laura to try and say that everyone in development is a one-man shop for many of their duties is an outright lie and a slap in the face to me. The privilege Laura granted the white staff made her overlook the fact that none of them fundraised by themselves. Joanna had a team, Rachel and Shelagh had each other to include Laura, the Board, and several Fundraising consulting firms STC hired to help them meet their fundraising goals. In addition to paying the fundraiser salaries, STC spent several hundred thousand dollars on fundraising consulting firms to assist in meeting the fundraising goal. Of which they did not. In Development Ops it was just me, Laura couldn't help either because she did not know how or discretely refused to, Joanna or her team didn't and when they did it was minimal.

In exhibit H, it appears that Laura is staging / attempting to make me appear as having inappropriate conduct as well as performance deficiencies. Laura starts her longwinded summaries off with April asked to meet with Greg because of her anxiety about what Greg told April she needed to start doing in the database, none of which I had asked her to do or given her training to do. For the record, based on my job description I did not need Laura's permission to ask April to use the CRM as all development staff need to or development ops can't keep up with their progress or the lack there of as development ops professionals are supposed to. Number 3 in my job description states that a specific job function of mines is to Direct how staff record, and advise staff how to

interpret fundraising-related information in the database and work with staff to streamline existing fundraising systems to increase funds raised. Am I missing something? Laura's vagueness about what I had asked April to do speaks to her lack of understanding what's needed for us to work together most efficient and effectively. April was asked to track her gift processing requests that need to be resolved on behalf of a donor in that donor's record as a reminder to the staff member who will need to fulfill her request. This feature exists in every CRM and prevents power-users such as myself from having to manage requests in my outlook inbox (CRM's are designed to send reminders within the system only) of which becomes intermingled with a host of other unrelated emails forcing me to have to take time to comb through hundreds of emails to find a request when the system is designed to do it with minimal data entry from the end user.

**Laura speaks to problems/obstacles vs. solutions** – truth is, Laura and the other white staff resisted my solutions because it put them to work and forced them to learn what they didn't know such as how to track their fundraising actions and activities through moves management, or how to properly track a contact of an organization. They were so privileged that they felt they did not need to use Tessitura yet alone get trained in how to. The DBA agreed that it is a must for the fundraiser's to learn how to use Tessitura when he and I sat down to work on the FY25 Plans because he recognized that the fundraiser's were not documenting their moves. Moves management alone requires that they be in the system, however, STC did not have a an adequately built moves mgmt procedure and rejected mines when they realized that it was a tool that supervised their efforts in real time.

**In this exhibit Laura speaks to the monthly gift's issue** and it appears that Laura is implying that I created a problem by not manually processing just 12 entries. That's extremely vague, yes it was only 12 records but each record required 12 entries each totaling to 144 entries. That's extremely time consuming and most efficiently handled via a global import as advised by Tessitura's support team as well as Angela Studley the Database Administrator for the Arizona Science Center who has worked with Tessitura for 10+ years (I met Angela at the TLCC event and we are thick as thieves, in fact, Angela had a lot to say about Brian and is willing to testify or provide a statement. This effort was an attempt by Laura to stage another email and make me appear as inappropriate as well as to make me feel inferior by dismissing my concerns and stating to me "get this done". Brian didn't want to do it and Laura didn't want to do anything about his resistance so she forced me to do it manually. Although Brian did not work in Development, he was responsible for the primary tool Laura was given to manage relationships and raise money. Not sure if Laura reached out to the Senior Director of IT when this transpired but I'm almost certain she did not. Laura's intention was to ensure that Joanna and Brian the tenured white employees get to manipulate the situation to their benefit. This request was one of many that pushed my work back, it took half a work day to complete. The global import would have only taken 10 mins if that.

**In this exhibit Laura speaks to FY25 plans -** Laura complains that the past Director of Development Operations Sarah Pultz did this work for us without much drama. Laura is staging again and refuses to mention that I did not have the user permission to do so. Brian granted it to Sarah and did not grant it to me until the day he showed me how to use it. Again, another indication that Laura is attempting to blame me for something completely outside of my control and that she lacks the knowledge necessary to ensure or at the least support my success. How do you not know what I can or cannot do in your system as the department executive? Laura only worried about meeting her fundraising goals be it legal or illegal, of which she was not meeting those goals yet she kept her job and got pay bonuses annually.

**In this exhibit Laura speaks to Disrespect** – this is Laura attempting to stage again while being extremely vague. What was it that she said I contradicted as I am not sure what she is referring to. However, I audio recorded the entire conversation and provided supportive information for it in my timeline narrative. Laura is correct in stating that during a team meeting I mentioned that we do not have a written fundraising strategy. When we left that meeting Laura seen me in the hallway and said "Stop saying that we don't have a fundraising strategy, it makes me look bad". What Laura continued to fail to realize is that without a written fundraising strategy we or should I say I

am feeling around in the dark unable to predict what we may encounter or strategize proactive approaches for working with Brian and others. Having a fundraising strategy is what keeps the development operations team busy as we have to be prepared for things happening now, that should've happened yesterday, or things we plan to do in the future. It allows us to ensure our tools are functioning as we need, and most importantly that the CRM is properly configured to support the fundraising strategy.

**In this exhibit Laura speaks to Assuming the worst** – Laura is lying when she indicates that she called the meeting with the head of IT and I. I audio recorded this entire conversation and I was so blind sided by the way it went left that I asked her why did we have today's meeting during it and Laura indicated that Brian McCloskey had asked us to meet. However, prior to the meeting Laura mentioned to me that we needed to meet with the head of IT to discuss our most recent challenges with Tessitura's functionality. It's why I immediately started the conversation talking about those things and tension's rose quickly because Brian McCloskey is a racist and I was not standing for it. He felt that I was putting to much pressure on Brian Grundstrom the Database Administrator. When you listen to the recording you will here I was calm the entire time but I still got his ass together, so much so that he raised out of his seat as if he wanted to fight, proceeded to yell at me while pointing his finger at me as if he was reprimanding a child and then stormed out of the room. Immediately thereafter I informed Laura that I believe Brian McCloskey is a racist and for 8-months thereafter Laura ignored my concern allowing for me to receive poor customer service from the IT team while at the same time blaming me for their resistance. Laura states that I complained on development colleagues, saying as professionals they should already know things I think they should know or be doing. Laura is being vague again to protect the knowledge gaps her team suffered. Often, I had to go behind the frontline fundraisers to correct their gift processing request. Joanna, a supposedly seasoned fundraiser would give me request to enter a donation in the system where she would give me the incorrect information for doing so. Meaning she would say the donation was from John Pohanka making it an individual's gift and not the Pohanka Foundation of which makes the gift a family foundation donation that needs to be tracked against the Pohanka family. I discovered that Joanna gave me the incorrect information because of the new process I had in place of which required all documentation be scanned to include the front side of the envelope it came in. With that, I was able to review what Joanna reviewed prior to forwarding me her request and have her resubmit the gift form with correct legal entity making the donation based on my assessing her work and the documentation. Or Shelagh, the Director of Corporate Relations, listing a company contact (an individual) on the gift processing request form as the legal entity making the donation and not the company forcing me to have to email her and ask is this a corporate gift or an individual gift and if its an individual gift why is it not coming from Joanna.

**In this exhibit Laura speaks to complaints re: onboarding and lack of training** – Laura is correct, I did inquire about onboarding and how it can be improved as a shared function amongst HR, IT, Accounting, and the hiring department. I also provided solutions for improving onboarding based on practices and approaches I have successfully implemented at other organizations. Laura failed to mention that I came to STC when their duress existed primarily from high turnover in her department. Laura's only staff member that was familiar with how to use Tessitura was quitting Shakespeare Theatre for Folger Shakespeare Library who offered her almost $30k more a year in salary. It's also very clear that other staff prior to myself also found STC's culture unfair and at times unnecessarily difficult hence the development departments high turnover. Me speaking on ill intent of donors was not an assumption as STC allowed its donors to receive benefits for contributions that pass through a Donor Advised Fund or IRA. When I brought it to STC's attention, and it's not like they didn't know already as this is a practice Laura implemented her entire tenure at STC, they admitted that the burden of proof for that is on the donor, I said to Laura, yes, but if we know and still accept and provide benefits then it means we will accept fraud for the sake of meeting the fundraising goal. Additionally, Laura admits it happening on the audio recording to Board Member Michael Beriss who also benefited from these transactions; and he's a Financial Advisor for Ameriprise. STC's business conduct surrounding accepting and receipting donations made me uncomfortable, especially the example Laura speaks to about the donor who asked to replace her $10k gala receipt with two $5k

receipts for a donation that was made via a corporate credit card. The donor provided partial information and that made me concerned along with STC's overall business conduct. And yes, Laura signed the receipt only because she wanted to not because I wouldn't. I was going to sign it although I was uncomfortable with it and looking back its clear Laura wanted to sign it because Laura was in the business of doing whatever it takes to meet her fundraising goal be it legal or illegal.

In this exhibit Laura speaks to overarching, ongoing critique of how STC operates - so this is not staged, however, Laura is not telling the whole truth. Their were instances where Laura or others on the team would ask me something specific, I sadly at times would have to refer back to their business conduct / practices and its affect on such or at the least its affect on causing me to work hard and not smart. Something STC became accustomed to as they allowed Sarah to learn as she go as and make as many mistakes as she needed until she learned. Sarah had no prior development operations experience and especially at the Director level. Laura also is correct in admitting that she at times would encourage me to quit, but her reason was because she valued the fundraiser's more then me and yes, Laura actually said those exact words out of her mouth, Laura also stated that Brian will retire soon so hopefully he wont be an issue for long. None of which helped me to be successful. Laura suggested I go to Folger and I said to her, why would I do that when they just fired Sarah Pultz in less than 90 days from hiring her. I believed that Folger would not take another Shakespeare Theatre employee after that because they offered Sarah $110k to leave Shakespeare almost $30k more then what she earned at Shakespeare Theatre, and that's no small investment.

In this exhibit Laura mentions Mistakes - Laura should've provided in the exhibit those clear instructions and full documentation that she is referring to. Most of the documentation did not work as written and I have the marked up version to show where things stopped working as written. For the example that Laura uses about Joanna requesting I run a donor's credit card for a monthly charge, she is correct in that I selected the incorrect system code in the drop down of which caused the card not to run as scheduled. However, once we discovered that was the issue I quickly corrected it and the card was run the very next day. Not to make an excuse, but the raw truth is that I had asked for the code glossary so that I would now what each option in the system dropdown represents but I never got that. Additionally, although the code read monthly in the naming, becuase of how I was trained by Sarah to run a credit card that's exactly how I did it. Sarah never showed me how to setup monthly credit card charges she showed me how to run a credit card through a batch as a one time charge. I'm not sure if everything else she said is correct without viewing the gift log I managed for tracking what fiscal year a donation was intended for. And for the Mrs. Mars record, I followed the same practice the org implemented before me even though they decided to point out that it was the incorrect to do but only when I did it. Mrs. Mars has gifts in her record that do not belong there that were entered before I was hired by Sarah Pultz and others. It be great if the finance team provides those many examples.

In this exhibit Laura speaks to Confusion & Resistance - Laura speaks of the gift form Joanna created and that Joanna updated the gift entry request form where she provides me the information necessary for getting the contribution in the CRM. The issue with the form is that Joanna at times would forward the gift request form to me listing the incorrect legal entity making the donation, or provide a request to enter a pledge without recording what the pledge amount was or splitting the gift between fiscal years because the payments over lap fiscal years. A pledge that is received in FY24 is not a split donation because its payments run into FY25. Long story short, the form was not the issue, the knowledge behind understanding how to capture donor intent was the issue and Laura oddly continued to make it appear as though I needed the form. That form truly was to satisfy Joanna by allowing her to continue business as she did with Sarah Pultz. Laura mentions that she asked for a better expense receipts and reimbursements process and that Cierra set one up online. What Laura failed to mention is that Cierra's process created extra work. Cierra did not name the receipts she uploaded causing for me to have to open each PDF file until I find the one for the transaction that I am expensing / reimbursing. It created more work then staff actually continuing the process they had in place prior to my hiring of which

consisted of staff providing their reciepts directly to the Director of Development Operations with their signatures and the purpose of the transaction, to be stored in a locked drawer until they're processed. Laura mentions that April was anxious about Tess entry after Greg told her she should be entering her work into Tess. This is vague. I asked April to enter her gift processing request in the donor's record as a reminder to me. This creates efficiency and saves the time of having to comb through my outlook inbox to find April's request amongst hundreds of other emails. And Worst, I managed my email inbox, Sarah Pultz old email inbox, Blake's old email inbox, and the departments general inquires inbox. So yes, having April use Tessitura for this simple task allowed me and all of us to work smart; I spend 90% of my time in Tessitura, April setting the reminder in Tessitura would remind me every day that I log in up until the reminder is marked as task complete. Tessitura is designed to never ever let me forget something as important as running a credit card on a specific date for a specific amount. I was willing to show April how to do this as it is very straight forward process that did not require any technical expertise. Laura speaks to me requesting Shelagh to create a new record for the relationships she establishes and that when she did so I said that Shelagh had not created the record correctly and that it needed a constituent code, and that we tried to figure out how to get constituent codes for Shelagh and that Greg insisted on talking about system-wide issues. That's staged; the truth is Shelagh or April had requested I run a credit card for a corporation and sent me the credit card details of which provided an individual's name. The contact Shelagh worked with at the corporation. So, I went into Tessitura to look up the individual and could not find a record and I looked up the coporation's name that Shelagh shared in the email request and it to did not exist in Tessitura. That's when i followed up with Shelagh and asked her to create the record, enter the credit card in it as she had those details, and to prevent from passing it around (the system was designed so that no other person would know a donor's credit card number other then the staff member they told it to, and I preferred to work in that way. My preference was not to accept credit card details over the phone or through email and to have the donor make the donation online through the company's website where they can do so securely while establishing if they want the system to save that credit card for future transactions or not. Shelagh never asked me to show her how to do so, instead she got with Joanna and had Joanna show her how to create a record in Tessitura but unfortunately Joanna showed Shelagh the incorrect process. And yes, I told Laura and Shelagh that we need to categorize the donor by applying a constituent code. What Laura was vague about was that months ago I mentioned to her the issue with constituent codes and that it was one of the many emails I sent to Brian that he has continuously ignored. When Brian finally decided to respond, he gave me a long email about how he can set up the code so that it post to the donor's record overnight like the system was designed to do for Board members. I asked Brian was it possible to just reactivate the old code, it took Brian weeks to agree to that via email. So again, Laura is blaming me for something that she got frustrated with me about because it pushed back on the resistance I was receiving from the IT team and her doing nothing about it of which by default heighten my expectations to a level that was unrealistic and unconducive to employee success. It was more aligned with burnout. Laura speaks to me frequently pushing back on receipts requests from frontline fundraisers with new issues and that while some of the issues are valid, the complexity of the process now and how time-consuming it has become is an issue in itself. Laura is staging, here's why, I pushed back on receipts that were processed by the box office as they frequently entered their gifts incorrectly causing the tax receipt report to generate the receipt details incorrectly. What Laura also fails to mention is that the report that lets us know what donor's need receipting was broken. The state of this report required hours of massaging and reviewing the information to ensure it is correct. For example, the tax receipt report was so broken that it would generate a receipt for Eric Siegler that was entered into his recorded incorrectly, adjusted to be entered in the correct record of Gerald Levert but in the tax receipt report it indicated that the gift belongs to Eric and never mention Gerald anywhere through out. So, I had to manually capture Geralds information to ensure he got receipted, but had I not been thorough in doing my job Gerald would have never been receipted/thanked for his gift. The process was time consuming because Laura lacked the knowledge to advocate for what she needed, Laura intentionally wanted to provide grace and privilege to her white tenured colleagues, and for refused to support me in requiring Brian, the database administrator work with me to get the report properly designed based on the information I need to properly prepare the contribution tax receipt.

In this exhibit Laura speaks to Office space - Laura is staging again, we all did collectively decide that I would move but what Laura is vague about was that Shelagh and Rachel decided to clean out the section because they needed to go through the files as they were their predecessors. The part about the move that made me uncomfortable was that Tim Fowler (white man) the Director of Operations initially moved me to the new cubicle area and had me facing the window without asking me where I wanted to sit, yet he let Shelagh decide where she wanted to sit in her new space. When I learned that I then asked Tim if I could be afforded the same privilege and pick my own seat to. He had to think about it and got back to me. Eventually, Tim allowed me to select my own arrangements as he did Shelagh. However, the move started to feel like Laura was looking to isolate me from the team of woman and place me in a cubicle by myself.

Laura speaks to Other STC Staff - Laura mentions that no one on the marketing team was willing to raise an issue with me because they all expected a negative or complicated response. While working at STC I had no bad encounters with the Marketing team, however, when I pointed out issues they created that resulted in compliance risks such as granted benefits to donors who legally should not receive them. What I will say is that providing solutions to business practices that needed improvement to staff who were use to being able to do whatever they wanted created friction. The friction got so bad that I left work one day for a midday dr's appt and my dr said that my stress levels were so high that my heart rate was abnormal and she sent me to the ER for testing of which I had an ekg and some blood work done. I was advised that it was the stress that caused me to faint and to have the irregular heart beat.

In this exhibit Laura speaks to Time Consuming - Laura mentions that my approach to informing her of my challenges / setbacks were time consuming and in most instances ended without resolution and that my go-to explanation is pointing out what's wrong with STC; Laura's ignorance was crippling to development operations at Shakespeare Theatre and contributed significantly to the high turnover in her department. It was time consuming trying to educate Laura or should I say teach an old dog new tricks.

In this exhibit Laura speaks to Confusion over duties - Laura is staging and it is why she is so vague. However, it's great to see Laura put her foot in her mouth by saying Greg assumes the duties he had at other agencies he's worked for are the correct ones of which implies that there should have been more existing material that she could have shared with me when hired to get me off on the right foot but instead she left me at the mercy of Sarah Pultz, someone who had worked at STC for approximately 6 years or better with the bulk of years working in the box office, and then Sarah quite for a job that would pay her more. Laura did not increase Sarah's pay to what she was willing to offer me when she hired me because deep down she knew that Sara lacked the expertise. I would only assume that the finance team would handle a task that impacted them such as a gift adjustment that required their approval and potential support from Brian the database administrator. That was the only thing I waited for Finance on. Looking forward to STC producing anything outside of that.

In this exhibit Laura speaks to Staffing Support - Laura is correct only in that I did not want to onboard a new employee with the resistance I was facing to include the challenges that existed with Tessitura. It would have complicated my world more to have to triage the operational challenges that currently existed while ensuring employee success.

In this exhibit Laura speaks to General unhappiness with STC - Laura mentions that in the development team meetings Greg rarely talks about things that relate to others in the department but instead talks about what isn't working and problems Greg is having. To that end, I used the team meetings to inform the staff of my challenges of which related to them as it affected their ability to align their actions so that in development ops we can archive those effectively. Laura also mentioned that on 9/3/2024 I made a comment that I didn't understand why people attended the Tess conference. This is staged, here is why; During this meeting I did mention to the team when it

was my turn to speak that I would love to learn what STC's intentions were for paying so much money to send 2 staff from IT- both Brians; 2 staff from Administration - the CFO and the Senior Accountant; 3 staff from the Marketing team - the associate director of Marketing, and 2 box office managers; and then just me from Development. I did mention that I learned a lot from attending the conference and that I was already implementing some of those things because it created efficiency allowing me to get more work done. Some of the efficiency's I learned required the database administrator to adjust how he conducted business and because IT leads the effort on Tessitrua's use at STC I asked the question.

In exhibit I Laura appears to be staging, lying about a conversation she and I had were Laura made it clear that she did not care how complex she made my work, and I constantly explained to Laura that it does not have to be this difficult. I never yelled at Laura, however, during this conversation Laura's approach was intentional in that she made it clear that she did not care about the system wide issues that affect my work and that I needed to adjust as Sarah Pultz did who was willing to spend hours doing work incorrectly, or inefficiently. The database administrators job primary function is to relieve end user's of challenges and setbacks with system functionality, to provide guidance to end users on how to best utilize the system to get what they need and because Brian did not like the idea that I to understood how to do that effectively he felt challenged as he began to realize that I was pointing out issues that impact productivity that were directly connected to his practices for administering and configuring the primary tool the fundraising team to include myself used to manage our work. Typically, this position lives in Development, however, when the system requires an IT component - meaning someone with expertise in SQL coding, it makes sense for the position to live in IT.

In exhibit I, Laura appears to be speaking to me having inappropriate conduct and being insubordinate. Laura is correct only in saying that she and I had conversations where I would have to reflect on her leadership practices and its impact on the dynamics of the development team's working relationship. And that Laura's intentions surrounding development operations and compliance created risk for myself and the organization as a whole. For Laura, she felt that most of her and my conversations were circular because I refused to allow her to spin the conversation in a direction that created privilege and leniency for her white colleagues over me all because she was use to Sarah jumping through hoops to complete simple task all becuase she was afforded the autonomy to do so as she learned the job of which she promoted into with no experience. The amount of mistakes Sarah made can be extracted from the CRM and they directly impact bookkeeping for current and past years. One example of her such is when Sarah entered the incorrect credit card in a donors record that got charged for $5000, and that happened after Sarah quit STC and was allowed to come back. The meeting that Laura says she had to end early I audio recorded the entire conversation and you can hear that I did not stop her at ever sentence and that I actually waited until it was my turn to speak or would chime in when appropriate as everyone else did who attended that meeting. Uploading mass amounts of data at once is a DBA function as it requires a global import a function that only the Database Administrator had end user permission to do. Because of Laura's ignorance on how to use a CRM, she did not recognize the solution allowed for hundreds of records to be updated with a host of information at a click of a button after preparing the data in cmv excel spread sheet format. A standard practice at any nonprofit. Additionally, prior to the 8/29/2024 meeting I believe Laura is referencing where she ended it early, the development team had a meeting where we discussed uploading files to Tessitura in donor's records such as grant agreements, corporate invoices, and bequest and I mentioned to Laura that we discussed this for an entire hour and were all in agreement on the business practice. From that meeting, within the next several days the database Administrator made the updates in the CRM so that we can begin using them. Laura's treatment towards me at this point was to make me miserable, create a hostile work environment where I am forced to work in burnout mode more then anyone else on the development team, and frankly I believe Laura was intentionally resisting my efforts to protect her financial interests, worked with others to stage false interactions amongst us as they were

feeling called out by my expertise, and frankly I believe Laura hoped that it would be so bad that I would quit as so many past operations staff had because I was disrupting the corporate misconduct and fraud.

| Page 3: [3] Commented [8] | William Coleman | 3/30/2025 11:01:00 PM |
|---|---|---|

In exhibit C, it appears that this complaint was made after Marco and I had a conversation that covered several challenges I was encountering that required I work with he and Brian Grundstrom to resolve. It also appears that Marco maybe upset working with him to learn why their established procedures were created challenges for the staff. Marco speaks to he and I speaking about the reimbursement policy for staff and that I wasn't properly trained. Here's the issue with that, he's correct, I wasn't properly trained and after 6 years of leading the development department and overseeing this effort Laura was challenged by it as well. I asked Marco why staff in my department did not now/struggled with the process such as Joanna and Laura herself. What Marco is leaving out is that I suggested, as my job description requires, that we adjust the onboarding process to include this in the new hire training. Marco agreed that it sounded like a good idea, but the tone of his voice made me feel like he didn't feel that it was a challenge for he and I discuss. I only ran it passed him because he works in Administration of which consist of the HR department. The idea I suggested also created efficiencies allowing for new hires to hit the ground with running. Marco also manipulated a question I raised to him by stating it incorrectly (Marco said that I asked why they in accounting cannot flag incorrect contribution tax receipts to a donor). To give you some background before I state the question I actually asked; just two months in working at STC I discovered that Sarah Pultz had made a host of incorrect gift entries to include a multiple adjustments for those entries. Prior to Sarah Pultz quitting STC, I assume that she got so caught up with trying to do a million things at once, in addition to learning on the job that she entered a $12,500 gift in the incorrect donor's record. Here's the kicker, Sarah never receipted the donor, so a month after her leaving I got around to doing so and the donor replied back to STC stating that they did not donate that much money to the organization. Now it was not my job to audit past time gift entries of the previous Director of Development Operations, but because this big mistake that had my signature on it I had to do the research to learn how in the hell something like that could ever happen. I all my years of doing this work I've never seen it. Come to find out, the gift passed through a 3rd party via wire. The 3rd party was a Donor Advised Fund transfer that consisted of multiple donors contributions and Sarah mixed them up. Typically, this is something that would be caught and corrected by the development team if it had a review and approval process in place that required all frontline fundraisers to ensure that the gift processor has captured the donor's intentions accurately, of which ensures that the fundraiser receive the credit for the gift coming in and update their personal trackers for reporting their actuals to goals. When I determined that it was a mistake development made and didn't realize the actual question I asked Marco was how does something like that make it past accounting. I also stated something like that would typically get captured in the reconciliation process by finance as they to are responsible for financial reporting and aligning dollars with individuals as well as organizations. After asking Marco the question he clearly was offended by the implication that his team dropped the ball on this as well and his response to me was I can't do everything. I'm not sure why he took a constructive conversation as if I was giving him a hard time, I merely was doing what my job description requires and that's work with Administration to ensure these challenges are resolved and to prevent them from reoccurring. Also, if Marco felt that I was lacking guidance, especially in Tessitura, why didn't he, Brian and others pull together to ensure employee success, my success so that we could all work together effectively. I believe Marco grew salty with my ability to understand how and why something happened before my hiring and that I wasn't afraid to speak about it in a constructive way that left no stone unturned.

| Page 3: [4] Commented [9] | William Coleman | 3/30/2025 11:25:00 PM |
|---|---|---|

In exhibit J, Marco is speaking to exhibit K where it appears that the Director of HR was upset that I asked about the onboarding process and if there was a way to soak up some of the administrative process during it. I found it odd that an organization that should be financially conscious in how it spends its money would not advise staff of their work-related responsibilities that impact finances. For example, if you gone give a staff member a company

credit card I expect that you will let them know all that they need to use it and to avoid any risk (STC was so loos with their processes that Cierra Culbertson, the Events Manager who promoted from Development Coordinator took the corporate credit with her on a family vacation for a week and lost it. Laura send me a text message on my personal phone over the weekend to inform me so that I can have the card shut off. I thought that was crazy and grounds for termination to be honest with you. Why does she have it on her and worst with her on vacation.) Not long before the emails in exhibit K, Joanna had hired two new employees during a time where STC was in duress attempting to plan it's FY25 budget for board approval, closing out FY24, and providing 4th qtr fundraising projections to name a few. Not to add, I was out for a the entire second week of August attending the Tessitura conference, so I asked the question and provided solutions so that I wouldn't be burnt out and also able to meet my deadlines for the priority assignments due soon, but everyone resisted my recommendations as if I was asking them to do something they were not already doing to some extent. As Joanna pointed out, the onboarding form was a starting point to consider my concerns but the organizational culture at STC felt retaliatory for all of the things I was unearthing that impacted operations/efficiencies that negatively affected my ability to be successful that could not be ignored or denied.

In exhibit L, it appears that James is upset with me expressing myself about my thoughts on my collaboration with Marco. It was a cry for help that he and Laura ignored. I had no clue of where to find what Marco had provided or I would've never reached out to him to begin with. Eventually, I was able to figure it out on my own by feeling my way around in the system.

| Page 3: [5] Commented [10] | William Coleman | 3/30/2025 11:40:00 PM |

In exhibit M, it appears that James and Brian McCloskey came together with an associate of thiers to stage an email in attempt to make me appear as having inappropriate conduct. During the DC Tug group virtual discussion, there were a host of Tessitura users from the east cost speaking up about their challenges with the software. I spoke only when allowed or if the floor was open for all to speak. I was very candid in my assessment of the systems functionalities and compared it to other sophisticated systems to explain my struggles with it. Essentially I kept it real as that's what the discussion was hosted for us to do. I found it very odd that someone on the call who does not work for Tessitura was so offended by my candidness that they would reach out to my employer and complain. When Laura informed me of this, I explained to Laura the things I said and indicated that the discussion may have been recorded. Since STC is considering the complaint to be true ask James to request the recording or is he just looking to make me out to be a bad guy. During the time of this email, James was already upset with me for hounding him about assisting Laura and I, more specifically me because I had to do it, with providing the necessary information for STC to renew its State Registrations where he resisted up until he realized that I was not just going to put down anything. James had no other choice or STC would loose it's authority to solicit donations in other states. Of which it ended up loosing it for two states during this time. After the DC Tug group discussion, a staff member at Tessitura provided me details to STC's Client Success Manager who is responsible for ensuring the organization gets what it needs out of Tessitura. Also, when I attended TLCC there were folks who were on that call who thanked me for articulating the pain points with Tessitura for end users regardless of their experince level in using it.